# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### NO. 3:10-cr-00069-FDW-DCK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **SHIRLEY INGRAM, JR., a/k/a RAHIM,** | ) | **ORDER** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## I. BACKGROUND

THIS MATTER is before the Court on Defendant Shirley Ingram, Jr.'s Motion to Suppress Evidence. (Doc. No. 9). The Court has reviewed Defendant's Motion as well as the Government's Response in Opposition (Doc. No. 14), the evidence presented at a hearing held before the undersigned on September 1, 2010, and the parties' supplemental briefings submitted at the Court's request. (Docs. No. 20, 23, 24).

Defendant was charged by Bill of Indictment with a single count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Defendant moves to suppress physical evidence found during a search conducted by Charlotte-Mecklenburg Police Department ("CMPD") on August 9, 2009. Specifically, Defendant moves to suppress a firearm and other evidence found in the trunk of a vehicle registered to Defendant's mother, Mrs. Elizabeth Mason, but driven exclusively by Defendant. Subsequent to the September 1, 2010 suppression hearing, the Government filed a Superseding Bill of Indictment, (Doc. No. 25), adding a count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C.

1

§ 924(c)(1), which makes Defendant eligible for a mandatory life sentence as a career offender under 18 U.S.C. § 3559(c). For the reasons set forth, Defendant's Motion is DENIED.

## II. FINDINGS OF FACT

Based on the record and the evidence presented at the suppression hearing, the Court makes the following findings of fact:

1. On August 9, 2009, Officer Barry W. Bright, Jr. and Officer Secundi of CMPD Metro Division responded to a domestic violence call at 2117 Sebastiani Lane in Charlotte, North Carolina.

2. Upon arriving at the scene, Officer Bright encountered Ms. Lachica Alexander who informed Officer Bright that her boyfriend had locked Ms. Alexander out of her house. Ms. Alexander stated that her boyfriend was a convicted felon and that there was a firearm inside the house.

3. Officer Bright directed Ms. Alexander to stand with Officer Secundi to the side of the door on the front porch and knocked on the front door of the house, identifying himself as CMPD and giving a voice command to open the door. Approximately two minutes later, Defendant Shirley Ingram opened the front door.

4. Immediately after Defendant opened the door, Officer Bright stepped into the house and frisked Defendant for weapons and found none. Responding to Officer Bright's questions, Defendant informed Officer Bright that he and Ms. Alexander had been in an argument over groceries.

5. During this discussion, Officer Bright noticed that Defendant was wearing an over-sized shirt made of a loose, silk-like material. In Defendant's shirt-pocket, Officer Bright was able to clearly see a prescription pill bottle.

2

6.     Officer Bright testified that the pill bottle's color had faded and the label had been removed. Officer Bright was able to observe the letters "H-Y" on the bottle, which, based on his experience, indicated the bottle contained, or at one point had contained, Hydrocodone. Officer Bright did not see a name on the bottle. Based on the appearance of the bottle, Officer Bright concluded from his training and experience that the pill bottle was likely used to transport narcotics.

7.     Officer Bright reached into Defendant's shirt-pocket and seized the pill bottle. Officer Bright saw that the pill bottle contained several different types of pills and a small bundle of what appeared to be marijuana. When Officer Bright asked Defendant what the pills were for, Defendant responded that one of the pills was Viagra and one was for his back.

8.     Officer Bright asked Defendant to wait with Officer Secundi on the front porch of the house and addressed Ms. Alexander, bringing her inside the house. Ms. Alexander asked if Officer Bright had found a gun on Defendant. When Officer Bright indicated that he had not, Ms. Alexander stated "well, if it's not on him, he's either hid it or it's in his car."[1] (Tr. 10).

9.     Ms. Alexander moved to the couch positioned near the front door and flipped the couch cushions over, dumping them on the floor. Finding nothing under the couch cushions, Ms. Alexander signaled for Officer Bright to follow her into the bedroom, where Officer Bright saw a Gain laundry detergent box lying under the bed. Ms. Alexander moved directly to the detergent box and Ms. Alexander pulled the box out from under the bed a few inches and

---

[1] The Court notes that this statement, taken directly from Officer Bright's direct examination at the suppression hearing, is hearsay. Counsel for Defendant did not raise an objection to this statement. However, "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980) (citations omitted). Accordingly, the Court will not disregard hearsay in consideration of this Motion.

lifted the top.

10. When Ms. Alexander opened the box, Officer Bright saw that the box contained a clear plastic bag containing what appeared to be marijuana sitting on top of a black nylon bag. It was later determined that the plastic bag contained more than ten (10) grams of marijuana.

11. Officer Bright removed the bag of marijuana and placed it on the bed. Officer Bright then lifted the black nylon bag and determined from the weight that the bag contained a heavy item, which Officer Bright suspected to be either a firearm or a heavy piece of metal.

12. Officer Bright unzipped the bag enough to observe the grip and butt of a firearm, later determined to be a H&K USP .40 caliber pistol, but noticed that the gun was secured in the bag somehow. Officer Bright placed the bag containing the gun on the bed as well.

13. Ms. Alexander was standing in the bedroom while Officer Bright examined the contents of the detergent box and observed Officer Bright's examination of the contents of the box. At no point during Officer Bright's inspection of the contents of the detergent box did Ms. Alexander voice any concern or objection.

14. After placing the marijuana and firearm on the bed, Officer Bright escorted Ms. Alexander to the couch and instructed her to wait. Officer Bright then went out onto the front porch and handcuffed Defendant, placing him under arrest. Officer Bright did not inform Defendant he was under arrest or explain to Defendant why he was being placed under arrest. Officer Bright did not read Defendant his Miranda warning.

15. Officer Bright testified that Defendant was placed under arrest for possession of the marijuana and H&K firearm found in the detergent box, not Defendant's possession of the pill bottle containing marijuana and other pills.

16. During a search of Defendant's person, Officer Bright found a key ring. Officer Bright

asked Defendant if the vehicle parked in front of the house, a gray 2003 BMW 745Li, was his vehicle. Officer Bright testified that Defendant "said it was his mother's and that [Officer Bright] could not search it." (Tr. 12).

17. Officer Bright called for additional units to assist Officer Secundi and himself from another CMPD division, the Freedom Division. Officer S.E. Gerson of CMPD Freedom Division was among the officers that responded to Officer Bright's call.

18. Upon arriving at the scene, Officer Gerson assumed the investigation from Officer Bright. Officer Gerson determined that a K-9 unit would be necessary to conduct a search of the exterior of the vehicle parked in front of the house and called Officer D.J. Brown of the CMPD K-9 to the scene. It is not clear whether a K-9 did a search of the exterior of the vehicle.

19. Both Officer Gerson and Officer Brown asked Defendant if they would be able to search the vehicle. Officer Gerson testified that Defendant told the CMPD officers "he could not give consent to search the car. It belonged to his mother." (Tr. 24).

20. Defendant testified that he did not tell the officers that the vehicle was his mother's, (Tr. 114), and instead testified that he affirmatively told them they did not have permission to search the BMW, stating "I told them, 'No, you can't search my car.' I said, 'Why do you want to search my car?'" (Tr. 88-89). After observing Defendant's demeanor on the stand and viewing Defendant's testimony at the September 1, 2010 suppression hearing in light of other evidence heard that day, the Court finds Defendant's testimony that he claimed ownership of the vehicle to the CMPD officers to be incredible and false.

21. Instead, the Court finds as a matter of fact that Defendant's independent statements to Officer Bright and Officer Gerson constituted a *disclaimer* of ownership of the vehicle and

a *disavowal* of authority to consent to a search. Defendant did not refuse a search of the vehicle; rather he pretended as if he could not authorize a search of the BMW.

22. It is uncontroverted, and thus the Court finds, that Defendant retained a possessory interest in the vehicle.

23. Officer Gerson ran the plates of the vehicle and determined it was registered to Mrs. Elizabeth Mason, Defendant's mother. Defendant testified during the suppression hearing that Mrs. Mason was indeed the registered owner of the vehicle, (Tr. 115), and that the note on the vehicle had been taken out in Mrs. Mason's name, although Defendant made the payments. (Tr. 107-09). Additionally, the vehicle was insured in Mrs. Mason's name.

24. Officer Gerson determined that, as the owner, Mrs. Mason's consent was necessary.

25. After Officer Gerson's attempts to retrieve a public service phone number for Mrs. Mason's residence proved fruitless, Officer Gerson placed a call to CMPD dispatch requesting that an officer make contact with Mrs. Mason.

26. Officer D.P. Klimasewiski, also of CMPD, answered the call and drove to Mrs. Mason's house at 1215 Beatties Ford Road, Charlotte, North Carolina, to ask her consent as the registered owner to search the vehicle.

27. When Officer Klimasewiski arrived at Mrs. Mason's house, he knocked on the front door and was greeted by Mrs. Mason. After Officer Klimasewiski identified himself as a police officer and stated that he was there to discuss the vehicle she owned, Mrs. Mason invited Officer Klimasewiski inside and they were joined by Mrs. Mason's husband, Mr. Benjamin Mason.

28. Once inside, Mrs. Mason began making conversation with Officer Klimasewiski, showing him pictures of relatives, including a photo of one of Mrs. Mason's sons who was a former

CMPD officer. Nothing during this interaction put Officer Klimasewiski on alert that Mrs. Mason may have lacked the mental capacity to freely and voluntarily consent to a search of the vehicle.

29. When Officer Klimasewiski first raised the topic of the vehicle, Mrs. Mason did not recollect the vehicle. However, when Officer Klimasewiski stated "your son might be driving it," Mrs. Mason was able to recall the vehicle and remembered going with Defendant to the Department of Motor Vehicles to register the vehicle in her name.

30. Officer Klimasewiski stated that the police needed her consent to search the vehicle. Mrs. Mason told Officer Klimasewiski that she had never driven the vehicle and did not own it. Mrs. Mason did not understand why the police needed her consent. Officer Klimasewiski informed Mrs. Mason that because she was the registered owner of the vehicle, she could consent to the search.

31. During Officer Klimasewiski's interaction with Mrs. Mason, she volunteered that one of her sons was a former CMPD officer. Mrs. Mason reiterated her support of the police on numerous occasions, stating at one point "Well, I'm supportive of you guys. Whatever you need to do to get in the car. If you need me to sign this form, I'll do that."

32. Mrs. Mason signed a consent form, witnessed by Officer Klimasewiski and Mr. Mason, permitting the police to conduct a search of the 2003 BMW 745Li.

33. Nothing in Mrs. Mason's behavior or physical demeanor indicated to Officer Klimasewiski that she lacked capacity to consent.

34. Officer Klimasewiski testified that: Mrs. Mason answered his questions intelligently; she behaved rationally in his presence; she understood Officer Klimasewiski to be a police officer; she understood both the nature of a vehicle search and what it meant for her to

consent to a search; and the search would be conducted on the vehicle registered to her. (Tr. 51-53).

35. Mrs. Mason's daughter, Mrs. Charlene Anderson, testified that Mrs. Mason respected the police and would voluntarily assist them. There is no evidence that Mrs. Mason's consent was the result of coercion or intimidation or was otherwise given involuntarily.

36. Unbeknownst to Officer Klimasewiski, according to Mrs. Anderson, Mrs. Mason suffers from Alzheimer's disease, although it is unclear when Mrs. Mason was diagnosed. Dating from 2008, Mrs. Mason began engaging in behavior such as hiding unopened mail and cash in grocery bags, engaging strangers in conversation, and sharing with them stories and photographs of people purported to be Mrs. Mason's relatives but in fact were not. Additionally, Mrs. Mason shot herself in the foot with a rifle but was unable to remember the incident a few weeks later, assuming the pain in her foot had been from stepping on a nail.

37. Mrs. Mason was placed in a nursing facility sometime after Officer Klimasewiski's interview on August 9, 2009, and before late November 2009. Neither the Government nor Defendant presented any medical records or expert testimony regarding Mrs. Mason's mental condition before, on, or about August 9, 2009.

38. Based on all the evidence presented concerning Mrs. Mason's mental capacity (e.g. Mrs. Mason's comprehension during Officer Klimasewiski's interview, Mr. Mason's willingness to sign the consent form as a witness, and Mrs. Anderson's hearsay statement regarding Mrs. Mason's diagnosis), the Court finds as a matter of fact that Mrs. Mason was of sufficiently sound mind and had adequate mental capacity to appreciate the consequences of consenting to the search.

39.    After securing Mrs. Mason's consent, Officer Klimasewiski requested that Mrs. Mason accompany him to the vehicle so that she could witness the search and, if need be, take possession of the vehicle when the search was finished.  Mrs. Mason declined, citing a persistent foot problem that made it difficult for her to walk.  Mr. Mason, her husband, ultimately went with Officer Klimasewiski to 2117 Sebastiani Lane for the purpose of witnessing the search of the vehicle and to take possession of the vehicle when CMPD was finished with their search.

40.    While Officer Klimasewiski was at Mrs. Mason's home, Officer Gerson continued with his investigation at 2117 Sebastiani Lane.  Officer Gerson found flight officer's credentials in the black nylon bag with the H&K firearm found in the detergent box.  The firearm was holstered and padlocked consistent with the manner in which flight officers maintain their firearms.

41.    Ms. Alexander's roommate is a flight deck officer.

42.    At Officer Gerson's request, Ms. Alexander called her roommate on her cell phone and was able to make contact with him.  Officer Gerson spoke with the roommate and ascertained that the firearm found in the detergent box was the roommate's federally-issued firearm and that the roommate normally kept the weapon in the closet in his bedroom, a different location than the one in which the detergent box containing the firearm was found.

43.    Shortly after Officer Gerson's conversation with Ms. Alexander's roommate, Officer Klimasewiski and Mr. Mason returned with Mrs. Mason's signed consent form.

44.    At this point, a search was undertaken of the vehicle.  During the search, Officer Gerson found:

       a.      A wallet containing Defendant's driver's license and an insurance card matching the

VIN of the 2003 BMW 745Li, issued in Mrs. Mason's name;

b.      Several pill bottles containing various pills, none of which were prescribed to Defendant;

c.      An open cooler in the trunk of the vehicle. The cooler smelled of marijuana and contained: a Glock Model 27, .40 caliber pistol; a plastic bag containing 1/3 gram of marijuana; a digital scale with residue of a substance containing cocaine; and

d.      Assorted groceries in plastic Food Lion grocery bags.

45.      After the items were seized and inventoried, Officer Gerson released the vehicle to the custody of Mr. Mason. Officer Klimasewiski followed Mr. Mason as he safely drove the vehicle to his house at 1215 Beatties Ford Road.

46.      Officers Bright and Secundi responded to the initial call at 1:18 PM. Officer Gerson arrived at the scene at 2:06 PM. Consent to search the vehicle was obtained at 3:54 PM, at which point a search of the vehicle was commenced.

### III. CONCLUSIONS OF LAW

It is well-established that "[s]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted). Among these exceptions is freely and voluntarily given consent. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Where, as here, "the prosecution seeks to justify a warrantless search by proof of voluntary consent," it may do so by showing "that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the . . . effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 170-71 (1974).

The question before the Court is whether the consent given by Mrs. Elizabeth Mason, the registered owner of the vehicle and Defendant's mother, is sufficient to permit the search of the vehicle.[2] Defendant argues that the Supreme Court's recent ruling in Georgia v. Randolph, 547 U.S. 103 (2006) prevented the police from seeking the consent of Defendant's mother after Defendant purportedly denied consent to search the vehicle, and thus the firearm should be excluded as the fruits of an unlawful search. Defendant also argues that even if the police acted lawfully in seeking Mrs. Mason's consent, Mrs. Mason lacked capacity to consent to the search, having shown signs of dementia prior to August 9, 2009. The Government counters that Mrs. Mason had capacity and

---

[2] The Court notes that pursuant to the Government's Letter to Defendant of November 2, 2010 (Doc. No. 35-1), regarding Count One of the Superseding Bill of Indictment, the Government intends to prove that Defendant knowingly possessed either the Glock pistol recovered from the vehicle, the H&K pistol recovered from 2117 Sebastiani Lane, or both. As noted above, the subject of the instant Motion is the evidence recovered from the vehicle. Counsel for Defendant conceded at the suppression hearing that the search of 2117 Sebastiani Lane was the result of Ms. Alexander's consent, and accordingly the seizure of the H&K pistol was lawful. (Tr. 94).

In an abundance of caution, the Court also concludes as a matter of law and based on the totality of the circumstances that the search of 2117 Sebastiani Lane was the result of Ms. Alexander's voluntary consent. The record indicates that Officer Bright was invited into the house by Ms. Alexander who, as a tenant of the house, had authority to do so, particularly here, where Defendant did not object. See, e.g., Georgia v. Randolph, 547 U.S. 103, 109 (2006). After leading Officer Bright to one of the bedrooms, Ms. Alexander went directly to a Gain detergent box lying underneath the bed, pulled it out, and lifted the lid of the box. Once the detergent box was open, Officer Bright was able to immediately identify a substance that appeared to be marijuana contained in plastic bag. Regardless of whether the plain-view doctrine or Ms. Alexander's consent is to be applied, the seizure of the marijuana found in the house was lawful.

After removing the marijuana from the detergent box, Officer Bright saw a black nylon bag underneath the marijuana and lifted it from the box, determining from its weight it either contained a firearm or some other heavy object. Officer Bright opened the bag and was able to view the butt and grip of a firearm later identified to be the H&K .40 caliber pistol. During Officer Bright's examination of the bag and its contents, Ms. Alexander was present and witnessed his actions but did not voice any concern or objections. Although it is true that lack of objection or mere acquiescence is insufficient proof of a party's consent, see, e.g., United States v. Davis, 657 F. Supp. 2d 630, 643-43 (D. Md. 2009), the totality of the circumstances demonstrate that Officer Bright's inspection of the detergent box was at Ms. Alexander's invitation, indicating she not only consented to the search but actively assisted in it. Cf. United States v. Scott, 387 Fed. App'x. 334 (4th Cir. 2010) (per curiam) (holding the Fourth Amendment was not implicated where a private party opened the defendant's computer file containing pornographic images in front of a government inspector where the inspector did not direct the private party to do so). Accordingly, the seizure of the H&K firearm was also lawful.

authority to give voluntary consent, and therefore the search of the vehicle was lawful. The Court will first address whether Defendant has standing to challenge the search of the vehicle before turning to Defendant's arguments.

## A.    Defendant's Standing to Challenge the Vehicle Search

At the outset, the Government disputes Defendant's standing to raise a Fourth Amendment challenge to the vehicle search. The Government argues that Defendant's repeated statements to CMPD officers that he could not give consent to search the vehicle because it belonged to his mother amounted to abandonment of the property, and therefore Defendant had no reasonable expectation of privacy in the vehicle.

It is true that "[w]hen a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized form it." United States v. Stevenson, 396 F.3d 538, 545 (4th Cir. 2005). However, while property rights are an important consideration in determining whether Fourth Amendment rights have been violated, they are not the only consideration. United States v. Salvucci, 448 U.S. 83, 91 (1980). A defendant's standing to challenge a search "is usually demonstrated by showing that the defendant had some property or possessory interest in the area searched," United States v. Dawson, 7 Fed. App'x. 208, 209 (4th Cir. 2001) (citing Rakas v. Illinois, 439 U.S. 128, 148 (1978)), but Defendant need not own the vehicle in order to assert his Fourth Amendment rights. Instead, the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Rakas, 439 U.S. at 143 (citations omitted); see also United States v. Manbeck, 744 F.2d 360, 374 (4th Cir. 1984) ("The privacy interest that must be established to support standing is an interest in the area

searched . . . .").

Merely disclaiming his ownership of the vehicle is not enough for Defendant to have abandoned his privacy interest in the vehicle as the Government alleges. 2 Wayne R. La Fave et al., Criminal Procedure § 3.2(h) (3d ed. 2007) (citations omitted); United States v. Hill, 237 Fed. App'x. 878, 882 (4th Cir. 2007) (finding the defendant's statement disclaiming ownership of a trailer did "not constitute abandonment of his standing to challenge the search . . . ."). "The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the property alleged to be abandoned." Stevenson, 396 F.3d at 546 (internal quotations and edits omitted). The record makes clear that Defendant retained a reasonable expectation of privacy in the vehicle. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) ("Factors that courts consider in determining if a person has a reasonable expectation of privacy in property held by another include whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property"). Defendant testified that he was the primary driver of the vehicle and that he made payments on the vehicle's note and paid the vehicle's taxes. (Tr. 89, 109, 115). Additionally, although there is evidence that Defendant gave a key to the vehicle to one of his friends and another to Mrs. Mason, the record indicates that Defendant maintained exclusive physical possession of the vehicle, (Tr. 89-90, 47-49), lending it out only on occasion. (Tr.99-100). In other words, although Mrs. Mason was the registered owner of the vehicle, Defendant treated the vehicle as if it were his own.

Simply put, Defendant retained a reasonable expectation of privacy in the vehicle and he therefore has standing to raise a Fourth Amendment challenge to the search of the vehicle.

**B.      Mrs. Mason's Authority to Consent**

1.      Application of Georgia v. Randolph

Defendant first argues that by seeking Mrs. Mason's consent after Defendant had already refused permission to search the vehicle, the CMPD officers violated the rule of <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006).  In that case, the Supreme Court limited the third-party consent doctrine articulated in <u>Matlock</u> and its progeny, holding "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent give to the police by another resident."  <u>Randolph</u>, 547 U.S. at 120.  Defendant contends that because he was present at the scene and refused the police permission to search the car, the search of the vehicle resulting from Mrs. Mason's consent cannot have been reasonable as to him.  (Doc. No. 20 at 9).  The question before the Court is whether <u>Randolph</u> applies to the circumstances of the present case.

As an initial matter, Defendant did not expressly refuse consent to search the vehicle. Construing the evidence in the record in the best possible light for Defendant, it appears that Defendant told Officer Bright that he could not search the vehicle before later telling Officer Gerson that he lacked authority to give consent.  The Court finds as a matter of fact, however, that Defendant's own testimony regarding his statements to the police was incredible and false.  Instead, the Court finds the record shows Defendant independently told both Officer Bright and Officer Gerson that he did not own the vehicle and thus could not consent to the search.  (Tr. 12, 24).

This distinction is an important one for the purposes of <u>Randolph</u>.  The defendant in <u>Randolph</u> "unequivocally refused" consent when asked by the investigating police officers if they could search his house.  547 U.S. at 107.  The Supreme Court found this fact to be a critical one in not only framing its holding, <u>see id.</u> at 120, but also in drawing a distinction in <u>Randolph</u> that allows

the third-party consent doctrine of Matlock and Illinois v. Rodriguez, 497 U.S. 177 (1990), to remain in tact. 547 U.S. at 121. In short, because Defendant did not unequivocally refuse consent in the present case, Randolph, by its own terms, does not apply. See United States v. Chavez Loya, 528 F.3d 546, 555 (8th Cir 2008) (concluding Randolph does not apply in the context of a vehicle search because the defendant "admitted that he did not expressly refuse consent"); United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) (holding the district court committed no error in denying a motion to suppress where the vehicle search of a taxi cab was made pursuant to a taxi driver's consent while defendant remained silent); United States v. Verma, No. H-08-099-1, 2010 WL 1427261 at *7 (S.D. Tex. April 8, 2010) (refusing to reach the question of whether Randolph invalidates a third-party consent search because "[the defendant] did not expressly withhold consent to search the car"). Additionally, because Randolph did not vitiate the third-party consent doctrine, see 547 U.S. at 120-122, the police could rely on a third party's valid consent to lawfully search the vehicle.

Defendant's argument that the police were foreclosed from seeking Mrs. Mason's consent thus fails. Because Defendant did not unequivocally refuse the police permission to search the vehicle but rather intentionally passed the consent decision to his mother, the police were not precluded by Randolph from seeking Mrs. Mason's consent.[3] Simply put, the Supreme Court's

---

[3] Even if Defendant had refused consent, it is not clear that Randolph would extend beyond the home.

A careful reading of the Supreme Court's decision in Randolph reveals that it was limited to "the circumstances here at issue" – a search of a home undertaken as a result of consent given by one co-tenant in the face of a present co-tenant's objection. See id. at 106-08. The majority's opinion turned primarily on the understanding that Fourth Amendment reasonableness is based upon "the great significance given to widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules. Id. at 110 (citations omitted). The Court reasoned that because "there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another," it followed that no co-tenant had the right to admit a guest over another tenant's objection. Id. at 114-15. Ultimately, the Court's focus was on the traditional import given to the house:

limited ruling in Georgia v. Randolph does not apply to the facts of this case.

### 2. Mrs. Mason's Common Authority Over the Vehicle

The Court next considers whether Mrs. Mason possessed sufficient authority over the vehicle to permit the police to rely on her consent. "Common authority" in the context of third-party consent "is not merely a question of property interest. Rather it requires evidence of 'mutual use' by one generally having 'joint access or control for most purposes.'" United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007) (quoting Matlock, 415 U.S. at 171, n. 7). It is unnecessary, however, for the Government to establish that Mrs. Mason had actual authority over the vehicle; apparent authority to consent to the search would be sufficient. Id. at 555 (citing Rodriguez, 497 U.S. at 188). Therefore, although there is evidence that Mrs. Mason had a key to the vehicle and would store items in the vehicle on occasion, (Tr. 110-12), suggesting that Mrs. Mason retained "joint access or control" over the vehicle, the Government may rely on the facts that led the police to reasonably

> Since we hold to the centuries-old principle of respect for the privacy of the home, it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people. We have, after all, lived our whole national history with an understanding of the ancient adage that a man's house is his castle to the point that the poorest man may in his cottage bid defiance to all the forces of the Crown.

Id. at 115 (internal quotations omitted).

    Because it is well-established that vehicles do not enjoy the same privileges as the home, see, e.g., South Dakota v. Opperman, 428 U.S. 364, 367 (1976); Rakas, 439 U.S. at 148, it is not evident from it's face that Randolph applies in the context of vehicles. Instead, the "widely shared social expectations" surrounding vehicles and shared chattel would, if anything, counsel against applying Randolph to that context, particularly in light of the Court's focus on the relationship that exists between co-tenants of *real* property. See United States v. King, 604 F.3d 125, 136 (3d Cir. 2010) ("our reading of Justice Souter's opinion for the Court, Justice Breyer's concurrence, and Chief Justice Roberts's dissent, leads us to conclude that the rule of law established in Randolph does not extend beyond the home"); see also Randolph, 547 U.S. at 131-32 (Roberts, C.J., dissenting) (recognizing that the "social expectation" that accompanies "shared information, papers, [or] containers . . . is that privacy has been shared with another," and therefore one assumes the risk that the confidante will share access with a third-party, such as the police); but see United States v. Murphy, 516 F.3d 1117, 1124 (9th Cir. 2008) ("there is no reason that the rule in Randolph should be limited to residences").

    Ultimately, the Court need not decide this question, however, because it has already held that Randolph does not apply to the facts of this case.

believe that Mrs. Mason had authority to consent. Id. ("As long as 'the facts available to the officer at the moment . . . warrant a [person] of reasonable caution in the belief that the consenting party had authority,' apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed" (quoting Rodriguez, 497 U.S. at 188)).

The record indicates that Defendant disclaimed his ownership of the vehicle at least twice before the police attempted to make contact with Mrs. Mason. (Tr. 12, 24). By denying his ownership of the vehicle and his authority to consent, Defendant freed the police to find someone who did have authority. Additionally, Defendant affirmatively and independently stated to both Officer Bright and Officer Gerson that Mrs. Mason was the owner of the vehicle. These statements alone were sufficient to give the police the reasonable belief that Mrs. Mason could consent to the search. See Hill, 237 Fed. App'x at 882 ("Here, [defendant] told the officers that his sister owned the trailer and that they had to seek consent from her. . . . [Defendant] provides no legal support for the conclusion that the officers were not entitled to rely on this information in determining whether the sister had authority to grant consent"); United States v. Stephens, 341 Fed. App'x. 947, 948 (4th Cir. 2009) (holding that the owner of a vehicle had authority to consent to a search of the vehicle and the containers therein); United States v. Guzman, 507 F.3d 681, 687 (8th Cir. 2007) (holding the owner of a vehicle "may consent to its search even if another person is driving it . . . . [and has] exclusive possession" it); United States v. Whitehead, 428 F. Supp. 2d 447, 451 n. 3 (E.D. Va. 2006) (recognizing in a case almost exactly on point that the title owner of a vehicle has authority to consent to a search where a defendant denies ownership). Officer Klimasewiski's encounter with Mrs. Mason on August 9, 2009 only bolstered that belief, when she confirmed that she had gone with Defendant to the state Department of Motor Vehicles to register the vehicle in her name. (Tr. 48).

Mrs. Mason's statement to Officer Klimasewiski that she did not drive the vehicle is not enough to undo the reasonableness of the officers' belief that Mrs. Mason could consent to the search. To conclude otherwise would allow criminal defendants to create a legal twilight-zone whereby nobody would have authority to consent to a search, a proposition which threatens to abrogate the third-party consent exception to the warrant requirement in its entirety. In this case, there is strong evidence suggesting Mrs. Mason was a straw-purchaser of the vehicle on behalf of Defendant. Permitting Defendant to structure the vehicle purchase in such a way that allows him to disavow his own authority to consent to a search and then deny the registered owner's actual and apparent authority to consent to the search would create a perverse incentive. The Court will not condone such conduct and concludes the facts available to the CMPD officers at the time supported a reasonable belief that Mrs. Mason had authority to consent to the search.

## C.     Mrs. Mason's Capacity to Consent

Defendant next challenges the Government's evidence that Mrs. Mason's consent was voluntary. Specifically, Defendant argues that because Mrs. Mason was suffering from dementia on August 9, 2009, she lacked the capacity necessary for voluntary consent. The Court disagrees.

"Voluntary consent is based on the totality of the circumstances." United States v. Boone, 245 F.3d 352, 361 (4th Cir. 2001) (citations omitted), and when the government seeks to rely on consent to justify a search, it bears the burden of proving the consent was freely and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Courts consider a number of factors to determine whether consent was given voluntarily, include the characteristics of the person giving consent (such as age, maturity, education, intelligence and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). Boone, 245 F.3d at 361-62. Where a defendant raises doubts

concerning a consenter's mental capacity, a determination of the voluntariness of the consent "requires a determination that the person was mentally competent to understand the nature of his act when he signed the 'Consent to Search' form . . . . This naturally entails an understanding of the nature of the consequences of his act." United States v. Elrod, 441 F.2d 353, 355 (5th Cir. 1971).

Defendant argues that, because Mrs. Mason suffers from Alzheimer's disease, her consent was not the "'act of one who knew what [s]he was doing and had a reasonable appreciation of the nature and significance of [her] actions.'" (Doc. No. 9 at 3 (quoting United States v. Dukes, 139 F.3d 469, 472 (5th Cir. 1998))). Mrs. Mason demonstrated signs of dementia dating to at least 2008 when she began engaging in unusual behavior such as wrapping cash and mail in paper towels and storing it in her room, (Tr. 62), forgetting the identity of her children, (Tr. 67, 71), and engaging strangers in familiar conversation. (Tr. 79). Additionally, on one incident prior to August 9, 2009, Mrs. Mason shot herself in the foot with a rifle but forgot about the incident a few weeks later, assuming the pain in her foot was the result of stepping on a nail. (Tr. 62-63). According to the testimony of Mrs. Mason's daughter, Mrs. Charlene Anderson, Mrs. Mason was diagnosed with Alzheimer's disease, although her testimony did not make clear when that diagnosis occurred, (Tr. 61), and was admitted to a nursing facility sometime after August 9, 2009, and before late November 2009. (Tr. 69-71).

The Government, however, presented evidence that Mrs. Mason appeared lucid and able to understand the nature of the consent she was signing. When Officer Klimasewiski appeared at Mrs. Mason's door, she recognized him as a police officer, (Tr. 45, 49), and invited him in the house. (Tr. 45). Once inside, Mrs. Mason began making conversation with Officer Klimasewiski, telling him about herself and showing him pictures of her family, including a son who was a former CMPD officer. (Tr. 47). There appears to be nothing in this encounter that should have signaled to Officer

Klimasewiski that Mrs. Mason may not have been competent to consent to the search. When Officer Klimasewiski first raised the issue of the vehicle and why he was there, Mrs. Mason initially denied owning any automobiles, until Officer Klimasewiski told her "your son might be driving it." (Tr. 47-48). At that point, Mrs. Mason was able to recall the vehicle and going with Defendant to the state Department of Motor Vehicles to register the vehicle in her name. (Tr. 48). Mrs. Mason demonstrated that she understood the nature of consent and was able to ask intelligent, critical questions when she told Officer Klimasewiski she did not understand why her consent was necessary since she did not drive the vehicle. (Tr. 48-49, 58). Mrs. Mason's husband, Benjamin, was present and witnessed the entire encounter with Officer Klimasewiski, signing the consent form as witness. (Tr. 50-51). Officer Klimasewiski testified that during his conversation with Mrs. Mason, she appeared intelligent, she behaved rationally and understood what it meant to search a vehicle. She did not exhibit any physical signs or symptoms indicating that she did not understand why Officer Klimasewiski was there, his identity as a police officer, or that the vehicle at issue was registered to her and would be the subject of the search. (Tr. 52). Additionally, both Officer Klimasewiski and Mrs. Anderson testified that Mrs. Mason had an affinity and respect for the police stemming from her son's service as a police officer and that she would voluntarily assist them. (Tr. 49, 81). There is nothing to indicate that Mrs. Mason was coerced or intimidated by Officer Klimasewiski into signing the consent form. Based on the totality of the circumstances, Mrs. Mason's consent was freely and voluntarily given[4] and was "the consensual act of one who knew what [s]he was doing and had a reasonable appreciation of the nature and significance of [her]

---

[4] The failure of Officer Klimasewiski to advise Mrs. Mason of her right to refuse consent does not undermine the voluntary nature of her consent. See Schneckloth, 412 U.S. at 249; United States v. Grap, 403 F.3d 439, 443 (7th Cir. 2005).

actions." Elrod, 441 F.2d at 355.

Defendant argues it is immaterial whether Mrs. Mason appeared lucid to Officer Klimasewiski and the dispositive issue is her actual mental capacity. Defendant cites Elrod, 441 F.2d at 356, which held "[n]o matter how genuine the belief of the officers is that the consenter is apparently of sound mind and deliberately acting, the search depending on his consent fails if it is judicially determined that he lacked mental capacity." However, based on the whole record, the Court judicially determines as a matter of fact that Mrs. Mason had the capacity to appreciate "the nature and significance of her actions." First, "[i]t should not be assumed . . . that anyone suffering from some type of mental disease or defect is inevitably incapable of giving voluntary consent to a search . . . ." 4 Wayne R. LaFave, Search & Seizure § 8.2(e) (4th ed. 2004). Second, though mindful of the burden to prove voluntariness resting with the Government, the Court notes that no evidence was presented by Defendant that Mrs. Mason's Alzheimer's would have affected her ability to comprehend the consent she was asked to sign. No medical records or expert testimony was presented by either side regarding Mrs. Mason's capacity to appreciate the nature of her actions. Additionally, although the record demonstrates Mrs. Mason was engaging in odd behavior prior to the August 9, 2009 visit from Officer Klimasewiski, it is not clear when Mrs. Mason was diagnosed with dementia or Alzheimer's. Furthermore, there is no evidence in the record as to the progression or level of her dementia. There is also no evidence that Mr. Mason raised any objections to Mrs. Masons' ability to consent, notwithstanding the fact that Mr. Mason observed the interview and signed the consent form as a witness. Nor is there any evidence that Mrs. Mason had a legal guardian when Officer Klimasewiski sought her consent.

Therefore, applying Elrod does nothing to change the Court's conclusion that Mrs. Mason's consent was freely and voluntarily given. Regardless of whether Mrs. Mason had been diagnosed

with Alzheimer's disease and engaged in odd behavior prior to signing the consent form, the Court judicially finds, based on the whole record, that she had the mental capacity to, and did in fact, voluntarily consent to the search.

Even though the Court believes Mrs. Mason's had sufficient mental capacity under Elrod's *post hoc* analysis, the Court believes the Seventh Circuit's approach, determining whether the officer's conclusion of voluntariness was reasonable in light of the consenter's behavior as presented to the officer, to be superior to the Fifth Circuit's Elrod approach. See United States v. Grap, 403 F.3d 439, 444 (7th Cir. 2005). In Grap, the court considered whether the defendant's mother, who had a history of mental illness, had given voluntary consent to a police officer to search her garage for stolen property. The court found that Mrs. Grap's interaction with the police officer "did not indicate that she lacked the requisite mental capacity to consent" and instead "would clearly indicate to a reasonable observer that Mrs. Grap sufficiently understood the consequences of her consent." Id. at 443-44. After considering the Fifth Circuit's approach in Elrod, the Seventh Circuit held that determining the consenter's capacity based on "what is reasonably apparent to a reasonable inquiring officer" is consistent with the deterrence incentive underlying the exclusionary rule. Id. at 444.

> The purpose of suppression of evidence obtained in an unreasonable search is to deter violations by officers of the Fourth Amendment. Obviously, they cannot be deterred by circumstances that are unknown to them, like the psychiatric history of the person consenting to a search. Thus, the exclusionary rule should not be applied when its application will not result in appreciable deterrence.

Id. at 444-45 (internal citations and quotations omitted). Additionally, the Grap court noted that this approach was analogous to the apparent authority doctrine. Id. at 445. "'Even if the [consenter] did not in fact have authority to give consent, it suffices to validate the entry that the law enforcement officers reasonably believe that she did.'" Id. (quoting Rodriguez, 497 U.S. at 182).

22

As noted above, the evidence of Mrs. Mason's interaction with Officer Klimasewiski presented by the Government "would clearly indicate to a reasonable observer" that Mrs. Mason understood the consequences of her consent.

The Court notes that this result is consistent with its determination that Mrs. Mason had common authority over the vehicle to grant consent. Defendant cannot have his cake and eat it too. The Court will not allow Defendant to rely on Mrs. Mason's capacity to contract by taking out the note and the insurance on the vehicle and registering the vehicle in her name, and then claim Mrs. Mason lacks capacity to consent to a vehicle search because she does not appreciate the nature of her actions. To allow otherwise would permit the Defendant to operate outside the law. The Court concludes that Mrs. Mason's consent was voluntarily given.

**D.     Length of Defendant's Detention**

Finally, Defendant argues that the length of time he was detained at the scene while the police obtained Mrs. Mason's consent was unreasonable and accordingly the evidence seized from the vehicle should be excluded as unlawful fruits. Defendant specifically argues that the nearly three hours he was detained violated the <u>Terry</u> standard. (Doc. No. 20 at 13 (citing <u>United States v. Brugal</u>, 290 F.3d 353, 358 (4th Cir. 2000))). This argument is without merit.

Here, Defendant was not detained under <u>Terry</u> but was instead placed under arrest by Officer Bright for possession of the marijuana and the firearm found at 2117 Sebastiani Lane. (Tr. 22). In fact, probable cause existed for the police to place Defendant under arrest for at least three offenses: (1) the domestic violence call to which Officer Bright initially responded; (2) the marijuana in the pill bottle that Defendant had on his person; and (3) the marijuana and firearm found in the detergent box in the house. Placing Defendant under arrest pursuant to probable cause in the forty-eight (48) minutes between when Officer Bright and Officer Gerson arrived on the scene (Tr. 32-33) is itself

reasonable. <u>Manbeck</u>, 744 F.2d at 375. After he was placed under arrest, Defendant was not detained at the house longer than was necessary. See <u>Cnty. of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991) (holding a 48-hour delay between warrantless arrest and initial appearance to be reasonable). Accordingly, the CMPD officers did not unreasonably extend Defendant's detention.

## IV. CONCLUSION

In conclusion, the search of the 2003 BMW 745Li was the result of the voluntary consent of a third-party possessing common authority over the vehicle to permit the search. Accordingly, the seizure of the items taken from the vehicle was lawful. Defendant's Motion to Suppress Evidence (Doc. No. 9) must be DENIED.

IT IS SO ORDERED.

Signed: December 28, 2010

Frank D. Whitney
United States District Judge